Edmund L. Shea, J.
This is an action commenced pursuant to Appellate Division approval as provided in section 5 of article XIV of the New York State Constitution, which gives an aggrieved party an opportunity to restrain a violation of section 1 of article XIV of the Constitution.
This case originally came before this court in 1973 in the form of an article 78 proceeding commenced by the plaintiffs herein in order to enjoin the enforcement of a regulation promulgated by the Commissioner of Environmental Conservation. The regulation challenged in that proceeding was 6 *585 NYCRR 196.4 which, inter alla, prohibited the landing of seaplanes on some 700 designated lakes which were completely surrounded by State-owned land within the Adirondack Park.
In 1973, this court in that proceeding denied the application for a preliminary injunction. (Helms v Diamond, 76 Misc 2d 252.) Subsequent to that time, the parties agreed to several continuances or extensions of time to enable the petitioners to consider their next moves in continuing their litigation. In December, 1975 the present plaintiffs petitioned the Appellate Division, Third Department, pursuant to section 5 of article XIV of the New York State Constitution for permission to commence a proceeding to challenge the constitutional validity of 6 NYCRR 196.4, as well as the State Land Master Plan as promulgated and adopted by the Adirondack Park Agency and various uses in the Adirondack Park. The Appellate Divison granted permission as follows: "Ordered that, insofar as petitioners’ motion seeks the consent of this court to institute suit to restrain violation of section 1 of Article XIV of the Constitution, the motion is granted, and in all other respects it is denied”.
On February 20, 1976, the summons and complaint of the action presently before this court were served on the defendants. On April 12, 1976, the defendants, as represented by the Attorney-General, moved to dismiss the second and third causes of action in the complaint.
The Adirondack Council, as representative for the Sierra Club, Atlantic Chapter; Adirondack Mountain Club; Association for the Protection of the Adirondacks; National Audubon Society; Wilderness Society, and the Natural Resources Defense Council, moved to intervene and such permission was granted. (Helms v Reid, Supreme Ct, Hamilton County, Oct. 12,1976 [Shea, J.])
After several further delays and adjournments, including a substitution of counsel on behalf of the plaintiffs, the plaintiffs cross-moved in the present action (hereinafter the constitutional action) for summary judgment on the second and third causes of action in their complaint.
Before the oral arguments on these motions in the constitutional action could be heard, the intervenors in the article 78 proceeding moved pursuant to CPLR 409 (subd [b]) and 7806 for summary determination of the issues raised in that proceeding. Plaintiffs herein cross-moved for a discontinuance of *586 that article 78 proceeding and oral arguments on the motions in both of these matters were heard in Elizabethtown, New York, on March 15, 1977. Subsequent thereto, this court allowed the discontinuance of the article 78 proceeding, with prejudice on the merits. (Helms v Diamond, Supreme Ct, Essex County, March 31, 1977 [Shea, J.])
The reason for going into the background of this matter is that the main issue which has been presented to this court is of the utmost importance to people living in the forest preserve lands of New York State, especially the Adirondack Park area, as well as the people of New York State as a whole. Actually, this case is another in a long line of challenges to various provisions of the Adirondack Park Agency Act (Executive Law, art 2). This particular challenge is as to the validity of the State Land Master Plan promulgated pursuant to such act.
Unlike the cases which have gone before this one, these litigants do not challenge the validity or constitutionality of the Adirondack Park Agency itself, but rather, they challenge the validity of various uses which have been permitted in the Adirondack Park, as well as the Master Plan which continues and promotes such uses, and any regulations promulgated thereunder.
This constitutional challenge is based upon an interpretation of section 1 of article XIV of the New York State Constitution which is more commonly called the "forever wild” clause. There is almost a total absence of court decisions construing this important provision in our State Constitution and the time has now come for a judicial interpretation of this provision so as to guide the future preservation of the unique Adirondack region of our State.
The first cause of action in the complaint sets forth the "forever wild” clause and then lists various uses undertaken within the forest preserve in the past and present by the New York State Department of Environmental Conservation (EN-CON), which the plaintiffs contend destroy the wild forest nature of the preserve because they all entail cutting significant amounts of timber and over use of the forest preserve area. The purported misuses are as follows: construction of 42 or more public campsites; dirt access roads to these campsites, along with various outbuildings, facilities, boat launchings, sewage disposal systems and the maintenance thereof; construction of hundreds of lean-tas, trails, jeep trails, fire roads *587 and paved roads other than those specifically authorized by the Constitution; construction and maintenance of ranger stations, fire watch towers, telephone and electrical transmission lines, as well as other utility lines; construction of boat launchings, parking lots and tent platforms; overuse and misuse of backwoods causing unreasonable widening of trails, littering and defoliation of areas, and finally allowing private individuals to adversely possess forest preserve lands to the preclusion of other citizens.
The second cause of action states that the Master Plan was formulated by the Adirondack Park Agency (APA) and EN-CON and was approved by the Governor on June 20, 1972, without ever having been submitted to the Legislature in its final form. It is asserted that the Master Plan establishes a land use classification system consisting of seven basic categories and that some uses are permitted in some areas and prohibited in others.
The basic theory behind the second cause of action is that the "forever wild” clause provides that all of the lands of the forest preserve shall be kept forever wild and no distinctions are made as to different uses in different areas within the preserve. Therefore, the plaintiffs contend, the Master Plan with its divisions of the forest preserve lands, actually alters the constitutional mandate that "all” the preserve lands will be kept forever wild, and that since such Master Plan was not adopted as a constituional amendment, it is unconstitutional and invalid.
The third cause of action is directly related to the initial relief which plaintiffs sought in their previously discontinued article 78 proceeding. Plaintiffs run an air taxi service with its main operation base on Long Lake. It is claimed that a significant proportion of their annual income resulted from their flying hunters and fishermen into the remote regions of the Adirondacks by the use of seaplane landings on lakes. 6 NYCRR 196.4, promulgated by the Commissioner of ENCON, Henry Diamond, prohibited the landings of seaplanes on 700 designated lakes, and plaintiffs claimed that such regulation was invalid on several grounds (among others) as follows:
(1) Such action was arbitrary and capricious.
(2) Such action was an abuse of discretion.
(3) Such action was made in violation of lawful procedure.
(4) Such action was outside the authority of the Commis *588 sioner of Environmental Conservation by the express provisions of the Adirondack Agency statute and the State Land Master Plan entrusted to the Department of Environmental Conservation for implementation.
In this third cause of action of this constitutional action the plaintiffs allege that 6 NYCRR 196.4 violates the "forever wild” clause and, therefore, is invalid. This allegation is accomplished through pleading in the alternative that each and every use to which the APA and ENCON have put the preserve, as set forth in the first cause of action, is constitutionally permissible under the "forever wild” clause. It is then alleged that the landing of seaplanes on these 700 lakes is no more deleterious to the wild forest nature of the preserve than these other uses, and therefore, any regulation (i.e., 6 NYCRR 196.4) which prohibits such use is violative of the "forever wild” clause.
The defendants move pursuant to CPLR 3211 (subd [a], par 7) to dismiss the second cause of action for failure to state a cause of action, and they request that this motion be treated as one for summary judgment pursuant to CPLR 3211 (subd [c]). This motion is joined in by the intervenors.
The general grounds for this motion are that the Master Plan was properly adopted by the Legislature and that there was no requirement that it be submitted to the electorate. Also, that the classification into various land use categories as established in the Master Plan is not in violation of the Constitution.
The defendants also move to dismiss the third cause of action pursuant to CPLR 3211 (subd [a], par 2) on the ground that as a matter of law this court does not have jurisdiction of the subject matter since the cause of action does not actually seek to restrain a violation of section 1 of article XIV and, therefore, does not come within the parameters of the Appellate Division order granting permission to institute this suit. They also seek dismissal of the third cause of action pursuant to CPLR 3211 (subd [a], par 7) on the ground that 6 NYCRR 196.4 is constitutional as a matter of law and the third cause of action fails to state a cause of action.
The plaintiffs cross-move for summary judgment treatment pursuant to CPLR 3211 (subd [c]) as to both the second and third causes of action, stating that no triable issues exist as to either cause of action. If unsuccessful on their cross motions, *589 the plaintiffs move for leave to replead the second and third causes of action.
All the parties agree that the first cause of action raises questions of fact which can only be decided after a trial and, therefore, no motions have been directed to that cause of action. However, the plaintiffs contended on oral argument, contrary to their cross motion for summary judgment, that the issue presented in the second cause of action (i.e., the constitutionality of the Master Plan) cannot be finally decided without a determination as to the constitutionality of the various uses set forth in the first cause of action and, therefore, no summary determination of the second or third causes of action may be made until a trial and findings of fact have been made as to the issues presented in the first cause of action.
Such an argument is not persuasive. The theory set forth in the second cause of action is that the concept of the Master Plan is invalid. The issue presented for determination is: Does the State Land Master Plan’s classification of the Adirondack Park land into seven land use categories violate the constitutional mandate of the "forever wild” clause?
This question can be answered without a factual determinación of the issues presented in the first cause of action. Whether or not some of those enumerated uses are found to be unconstitutional in no way affects the basic question of the constitutionality of the Master Plan.
Since there are no factual issues presented concerning the main issue presented in the second cause of action as set forth above, this issue must be met and determined by the court.
The "forever wild” clause has been a part of the New York State Constitution since 1894, but there is almost a total absence of court decisions concerning this significant constitutional provision.
Section 1 of article XIV of the New York State Constitution presently provides, in pertinent part, as follows: "Section 1. The lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed.”
Section 1 also provides for the construction of a highway *590 through forest preserve lands from Glens Falls to Plattsburgh, popularly called the Northway, and also provides for the construction of ski trails on several mountains located within the forest preserve. Provisions are made for maintaining State roads and for eliminating hazards thereon within the preserve and a clause allows the exchange of State lands with the Village of Saranac Lake in order to provide a refuse disposal for that village. The final provision in section 1 allows the exchange of land with the Town of Arietta in order to extend the landing strip of the Piseco airport.
Section 3 of article XIV declares that forest and wildlife conservation are policies of the State and goes on to provide that forest preserve lands outside the Adirondack and Catskill parks may be designated by the Legislature for public recreational purposes.
The forest preserve was created by chapter 283 of the Laws of 1885 which provided at section 8 thereof: "The lands now or hereafter constituting the forest preserve shall be forever kept as wild forest lands. They shall not be sold, nor shall they be leased or taken by any person or corporation, public or private.”
The Forest Commission was created and given the duty to care for and operate the forest preserve. (L 1885, ch 283.)
. Today the definition for the forest preserve is found in ECL 9-0101 (subd 6).
The forest preserve which includes land within both the Adirondack and Catskill regions in 16 different counties designated by the Environmental Conservation Law, actually only consists of the State-owned land within these counties which is wild. The forest preserve does not consist of solid blocks of State-owned land, but rather resembles a "quilt” or "patchwork” pattern of private holdings intermixed with forest preserve lands. (New York State Office of Legislative Research, Report on Constitutional Protection of Forest Preserve [June, 1967].)
. Historically, the forest preserve was given constitutional protection to bring a halt to the commercial exploitation of the State’s forest preserve, and presumably, to protect them for use by all the people of the State. (Kissell, Permissible Uses of New York’s Forest Preserve Under "Forever Wild”, 19 Syracuse L Rev 969.)
By chapter 707 of the Laws of 1892, the Adirondack Park *591 was established which was comprised of lands in various designated counties constituting the forest preserve. Such park lands were to be "forever reserved, maintained and cared for as ground open for the free use of all the people, for their health or pleasure, and as forest lands necessary to the preservation of the headwaters of the chief rivers of the state, and a future timber supply”. (L 1892, ch 707, § 1.)
"A tendency to sell or lease such Forest Preserve lands by legislative authority early became evident. (Laws of 1887, chap. 475, amdg. Laws of 1885, chap. 283, § 8; Laws of 1892, chap. 707, § 9.) Chapter 332 of the Laws of 1893 revised and consolidated the preceding acts and gave to the Forest Commission greatly enlarged powers, including authority for the sale of certain timber standing in any part of the Forest Preserve, the sale of such Forest Preserve lands as, in the opinion of the Commission, were not needed to promote the purpose of the Forest Preserve, the lease of camp sites in the Forest Preserve, the laying out of paths and roads in the park, and the sale of certain standing timber, the fallen timber and the timber injured by blight or fire on any of the State forest lands.” (Association for Protection of Adirondacks v MacDonald, 228 App Div 73, 77-78, affd 253 NY 234.)
In 1894 a Constitutional Convention was convened and it established a five-man committee to study the problem of amending the Constitution in order to circumscribe the powers of the Forest Commission which had been conferred by the Legislature. (Rev Rec of Constitutional Convention of 1894, vol 1, pp 1100, 1148; vol 2, p 57.)
That convention specifically adopted the language which constitutes the present "forever wild” clause as previously set forth. The records of the convention may properly be used to determine the meaning of this provision. (Matter of Dowling, 219 NY 44.) This source of interpretation was used extensively by the Appellate Division, Third Department in the MacDonald case. An extensive quotation of some of this language is instructive at this point. Beginning at page 78: "Such study makes it clear that one purpose of the framers was to preserve the timber 'intact.’ The special committee of the Convention, which formulated the amendment, so stated in its report. Mr. Choate asked the chairman of the committee: 'Whether the scope of the amendment as it stands is that in no event could the Legislature authorize a railroad or highway to be built through these forests while the amendment lasts?’ The *592 reply was: T think so, sir.’ He added: T would say, Mr. Chairman, in answer to the question that the scope of the matter, as it is amended, is to prevent its being taken by any corporation, public or private.’ The proposal of the committee was thereafter amended in the Convention by the addition of the words 'removed or destroyed’ after the phrase 'nor shall the timber thereon be sold’. The Convention rejected a proposed amendment adding the words 'except that fuel may be sold to State lessees or residents within such park’. The chairman of the committee said: 'We think it would be exceedingly dangerous to allow the Commission to sell timber for camp-fires. Any campers that cannot pick up something on the shores, that will not be timber, to warm themselves with, would better either carry in their fuel or stay out. It would be opening the door to a great danger.’ Another member of the committee stated: 'The moment you put in any provision that anybody can cut timber there, then you destroy the effect of the whole amendment.’ The possible 'thinning out’ of the forests on future scientific advice was discussed, and it was said: 'no man has yet found it possible to improve upon the ways of nature’. Destruction of trees by flooding, through the erection of dams, was decried and was one of the reasons suggested for adding the word 'destroyed’ to the amendment. The Forest Preserve was spoken of primarily as a great water supply and also as a vast sanitarium where thousands go to have their health restored and their vigor renewed. Mr. Brown stated to the Convention: T say, sir, it is necessary to close the door unless you want this great water supply, this great sanitarium, this great health resort of our State that is known from ocean to ocean, and from land to land, destroyed, that you must shut the door, and you must close it tight, and close it right away.’ Other amendments to the clause proposed by the committee were advocated by delegates, but were rejected — one for exchange of lands; another authorized the Legislature 'by suitable laws’, to provide for the preservation and protection of the forest; another excepted certain lands; and another proposed to insert after the word 'leased’ the words 'otherwise than is now provided by law’. The Convention deliberately chose to perpetuate the Forest Preserve as just 'wild forest lands’. Not a door was permitted to be open which might convert this preserve into anything but a wilderness. Hampering limitations were rejected. To 'shut the door’ and 'close it tight’, the Convention provided: 'nor shall the timber thereon be sold, removed or destroyed. ’ (See 1 Revised Record 1894 Const. Convention, 1201; 4 id. 124-163, 705-709.)”
*593 As can be seen by the preceding discussion, the framers of the constitutional provision apparently intended a strict interpretation of its language and application of its principles. The lands of the forest preserve were to be retained in their wild forest state, and it is clear that the application of the principle de minimis was not to be applied in the forest preserve.
Other than the interpretation given this "forever wild” clause by the Appellate Division and the Court of Appeals in the MacDonald case, the only authority we have to aid in the decision are the various opinions of the Attorney-General in which the "forever wild” clause of the Constitution has not been uniformly interpreted. Certain trends do seem to be obvious such as a strict approach or construction in the early opinions, with a more liberalized or possibly a more reasonable approach since the MacDonald decision in 1930. With very few exceptions, and especially despite the 1935 opinion which approved the cutting of timber to enhance vistas on pedestrian trails, the Attorney-General has consistently prohibited the cutting of trees if such cutting would impair the wild forest character of the forest preserve.
To demonstrate the frequency of the opinions over the years and for reference purposes only, the court cites the opinions rendered from 1895 to 1954. (1895 Opns Atty Gen 89; 1899 Opns Atty Gen 343; 1902 Opns Atty Gen 200; 1903 Opns Atty Gen 364; 1907 Opns Atty Gen 327; 1908 Opns Atty Gen 144; 1909 Opns Atty Gen 663; 1910 Opns Atty Gen 766; 1915 Opns Atty Gen [vol II] 190; 1919 Opns Atty Gen 266; 1921 Opns Atty Gen 130; 1921 Opns Atty Gen 124; 1925 Opns Atty Gen 216; 1927 Opns Atty Gen 252; 1933 Opns Atty Gen 369; 48 NY St Dept Rep 589; 1934 Opns Atty Gen 279; 1934 Opns Atty Gen 315; 1935 Opns Atty Gen 272, 308; 1940 Opns Atty Gen 315; 1948 Opns Atty Gen 159, 166; 1949 Opns Atty Gen 132; 1950 Opns Atty Gen 148, 149, 153, 154; 1954 Opns Atty Gen 157.)
It is obvious that very practical problems can arise if it is deemed necessary to pass a constitutional amendment to authorize each and every particular public use within the forest preserve.
The MacDonald case may have settled this problem by providing in dicta that the use of the forest preserve by the public is subject to reasonable regulation by the Legislature which permits all necessary activities. These standards of *594 "reasonable” and "necessary” obviously raise problems in the implementation of such a decision and require factual determinations as to each use sought to be made of the preserve.
By section 3-0111 of the Environmental Conservation Law (presently ECL 3-0301 and 9-0105), the Environmental Conservation Department is given the authority to make rules and regulations for the use of the forest preserve. Apparently, it is the Environmental Conservation Department which has been delegated the authority to determine what are "reasonable” and "necessary” uses of the forest preserve lands. This delegation of authority presents a real problem, since as was previously stated, the Constitution appears to severely restrict the Legislature in determining what activities may be carried on in the forest preserve, and the Legislature cannot delegate powers which it does not itself possess. It is pursuant to this grant of authority that the Conservation Department has authorized the construction of public campsites within the preserve. (NYS Conservation Dept Report, The Adirondacks, New York’s Forest Preserve and a Proposed National Park, p 45 [1967].)
The major case interpreting the "forever wild” clause is Association for Protection of Adirondacks v MacDonald (228 App Div 73, supra). The question before that court was whether a statute passed by the Legislature providing for the construction of a bobsled run on forest preserve land and the necessary cutting of some 2,600 trees was violative of section 7 of article VII of the Constitution (presently art XIV, § 1). The Appellate Division had carefully traced the adoption of the forest preserve language and then made a careful inspection of the record from the 1894 Constitutional Convention where the "forever wild” clause language was adopted as a proposed amendment to the Constitution. The Appellate Divison concluded that the constitutional mandate was clear and in declaring the statute unconstitutional stated at page 81: "Giving to the phrase 'forever kept as wild forest lands’ the significance which the term 'wild forest’ bears, we must conclude that the idea intended was a health resort and playground with the attributes of a wild forest park as distinguished from other parks so common to our civilization. We must preserve it in its wild nature, its trees, its rocks, its streams. It was to be a great resort for the free use of all the people, but it was made a wild resort in which nature is given free rein. Its uses for health and pleasure must not be incon *595 sistent with its preservation as forest lands in a wild state. It must always retain the character of a wilderness. Hunting, fishing, tramping, mountain climbing, snowshoeing, skiing or skating find ideal setting in nature’s wilderness. It is essentially a quiet and healthful retreat from the turmoils and artificialities of a busy urban life. Breathing its pure air is invigorating to the sick. No artificial setting is required for any of these purposes. Sports which require a setting that is man-made are unmistakeably inconsistent with the preservation of these forest lands in the wild and natural state in which Providence has developed them.”
It is the decision of the Court of Appeals upon the appeal of the foregoing decision (253 NY 234) which is the leading case in New York for instruction as to the interpretation of the "forever wild” clause, and counsel for both parties in the present litigation cite the case as support for their positions.
The Court of Appeals decision in MacDonald is of great importance and must necessarily be the guiding light in the analysis of the "forever wild” clause which this court must follow in rendering its opinion. At page 238 Judge Crane states: "The words of the Constitution, like those of any other law, must receive a reasonable interpretation, considering the purpose and the object in view. (State of Ohio ex rel Popovici v. Agler, 280 U. S. 379.) Words are but symbols indicating ideas and are subject to contraction and expansion to meet the idea sought to be expressed; they register frequently according to association, or like the thermometer, by the atmosphere surrounding them. The purpose of the constitutional provision, as indicated by the debates in the Convention of 1894, was to prevent the cutting or destruction of the timber or the sale thereof, as had theretofore been permitted by legislation, to the injury and ruin of the Forest Preserve. To accomplish the end in view, it was thought necessary to close all gaps and openings in the law, and to prohibit any cutting or any removal of the trees and timber to a substantial extent.”
This language sets forth that the purpose of the "forever wild” clause was to prevent the commercial exploitation of the forest preserve which had previously been sanctioned by the Legislature, and it appears to be the court’s feeling that some cutting is permissible as long as it is not a substantial amount. Continuing on page 238: "The Adirondack Park was to be preserved, not destroyed. Therefore, all things necessary were permitted, such as measures to prevent forest fires, the *596 repairs to roads and proper inspection, or the erection and maintenance of proper facilities for the use by the public which did not call for the removal of the timber to any material degree.”
This language indicates the court’s recognition of the fact that even though the Constitution was intended to protect and preserve our natural forest lands, such protection does not prohibit use and enjoyment of the areas by the people of the State. Such a principle is based upon the theory that the forest preserve was for the use and benefit of the people and was not to be an isolated area in which no man would wander. (People v Adirondack Ry. Co., 160 NY 225, affd 176 US 335.)
Beginning on page 239 of the MacDonald case the court gives a summary of the adoption of the "forever wild” clause:
"The laws developing the Forest Preserve and the Adirondack Park, up to the Constitution of 1894, are reviewed in the opinion of this court in People v. Adirondack Ry. Co. (160 N. Y. 225). By chapter 707 of the Laws of 1892 the State Park, known as the Adirondack Park, was created within certain of the Forest Preserve counties. Such park is to be 'forever reserved, maintained and cared for as ground open for the free use of all the people for their health or pleasure, and as forest lands necessary to the preservation of the headwaters of the chief rivers of the State, and a future timber supply.’
"Chapter 332 of the Laws of 1893, combining all previous acts, gave to the Forest Commissioners authority to sell certain timber on the Forest Preserve and also power to sell such of the lands as were not needed. They were also authorized to lease camp sites and lay out paths and roads in the park. Then came the Convention of 1894 with the debates indicating a change of policy regarding the sale and destruction of timber and the use of the lands. (Revised Record of the Constitutional Convention of 1894, vol. I, pp. 1100, 1148; vol. II, pp. 57, 1201; vol. IV, pp. 128, 137.)
"At the time of the assembling of this Convention, the law of the State authorized the sale, lease, clearing and cultivation of lands in the Forest Preserve and the sale of standing or fallen timber thereon; also permitted the laying out of paths and roads through the property. (See chap. 283, Laws of 1885; chap. 475, Laws of 1887; chap. 707, Laws of 1892; chap. 332, Laws of 1893.)
"With these laws before them and the statements in the debates revealing the depredations which had been made on *597 the forest lands, and the necessity for restricting the appropriation of trees and timber, section 7 of article VII was adopted and became part of the Constitution January 1, 1895, where it has remained ever since.
"No longer was the land or timber to be sold or even condemned for public purposes. (People v. Adirondack Ry. Co., supra.) The forests were to be preserved as wild forest lands, and the trees were not to be sold or removed or destroyed. Whereas the Legislature had authorized the building of roads through these lands, this power was thereafter conferred not through legislation, but by constitutional amendments adopted in 1918 and 1927. The section with these amendments now reads: 'Nothing contained in this section shall prevent the State from constructing a State highway from Saranac lake in Franklin county to Long lake in Hamilton county and thence to Old Forge in Herkimer county by way of Blue Mountain lake and Raquette lake, and nothing shall prevent the State from constructing a State highway in Essex county from Wilmington to the top of Whiteface mountain.’ If it were deemed necessary to obtain a constitutional amendment for the construction of a State highway, the use to which the Forest Preserve might be put with legislative sanction was greatly limited. Trees could not be cut or the timber destroyed, even for the building of a road. This seems to be a fair conclusion to be drawn from the adoption of these constitutional amendments after the Constitution of 1894.”
Following this summary of the insertion of the "forever wild” clause in our Constitution, the court continues with the language which the Attorney-General cites as support for his argument in the case presently before this court. At page 240 in MacDonald that court states:
"What may be done in these forest lands to preserve them or to open them up for the use of the public, or what reasonable cutting or removal of timber may be necessitated in order to properly preserve the State Park, we are not at this time called upon to determine. What regulations may reasonably be made by the Commission for the use of the park by campers and those who seek recreation and health in the quiet and solitude of the north woods is not before us in this case. The Forest Preserve and the Adirondack Park within it are for the reasonable use and benefit of the public, as heretofore stated. A very considerable use may be made by campers and others without in any way interfering with this *598 purpose of preserving them as wild forest lands. (See 'The Problem of the Wilderness’ by Robert Marshall in 'The Scientific Monthly’, Feb. 1930, p. 141.)”
Although the court carefully prefaces its remarks in order to indicate clearly that this language is merely dicta, its import appears to come through loud and clear. Reasonable cutting and removal of timber is permitted, as well as reasonable regulations promulgated by the body in charge of the Adirondack Park so that campers and others may receive their full recreational benefit from the area, always remembering that such enjoyment must not harm or injure the wild forest nature of the preserve in any way.
It does not seem to be reasonable to interpret the "forever wild” clause as requiring a constitutional amendment any time any timber whatsoever is to be cut in the preserve no matter what the purpose.
The reasonable interpretation seems to be to eliminate all commercial cutting as was clearly the intention of the framers of this provision, and to allow the reasonable cutting necessary to protect the forest preserve such as fire towers and access roads. Also, to allow such reasonable cutting as is necessary to enable the public to safely use the preserve which was another founding principle. The definition of reasonableness in these situations should be a cutting that is necessary for the purpose, but which does not injure in any way the wild forest character of the very preserve which the Constitution seeks to protect.
By eliminating the commercial aspect of the preserve, we are squarely faced with the inevitable problem which has faced the court in MacDonald and several other courts more recently in construing the APA legislation, as well as that problem continuously faced by the Attorney-General over the decades.
How do we preserve the wild forest character of the forest preserve and at the same time enable the public to use and enjoy it as was intended by the framers of this constitutional provision? The two concepts are diametrically opposed as it is precisely man’s presence in the preserve which threatens its wild forest character in the first instance. By eliminating the commercial aspect the major portion of the problem has been solved, but it is still necessary to arrive at some formula or balance in order to fully satisfy the constitutional mandate.
If we assume that a constitutional amendment is not neces *599 sary for every use in the preserve which requires a cutting of timber, then we must apply our reasonableness standard to proposed uses. The question then becomes, who is to apply this standard?
It would appear that although the Constitution has deprived the Legislature of any power to authorize a cutting of timber in the forest preserve for commercial purposes, it has not deprived that body of its power with respect to public purposes. The MacDonald decision has allowed the Legislature the power to make reasonable regulations as to this public use and preservation, and such use and preservation must necessarily include some cutting of timber.
Since the Legislature still retains at least this limited authority, it may properly delegate this authority to the administrative agency best adapted to applying the principles heretofore enumerated. This is precisely what our Legislature has done by the creation of the Adirondack Park Agency.
The forest preserve was first created by chapter 283 of the Laws of 1885 and section 8 of that law provided that the lands within the forest preserve should be forever kept as wild forest lands. (This was the inception of the forever wild clause, but at this time it was merely a statutory provision. As previously discussed, the constitutional forever wild clause became operative on January 1, 1895, and the language has remained virtually unchanged since that time.)
Chapter 283 of the Laws of 1885 also created the Forest Commission and vested it with the duty of caring for and operating the forest preserve.
In an early Court of Appeals case, the court held that the Forest Commission had the actual possession of the lands embraced within the forest preserve. (People v Turner, 145 NY 451.)
A subsequent case by the State’s highest court again discussed the role of the Forest Commission in supervising these forest preserve lands. (People ex rel. Turner v Kelsey, 180 NY 24.) At page 26 that court stated: "Not only are these lands brought within the protecting power of the Constitution, but that of the legislature as well. Various statutes have been enacted by which the police power is extended over this territory. It is made a public park, placed under the care, control and supervision of a commission.”
These early cases clearly show that the forest preserve *600 lands were to be subject to supervision by the Forest Commission and such supervision and control necessarily included regulation of various uses within the preserve to further the constitutional mandate of "forever wild” which blanketed all forest preserve lands.
The Adirondack Park was initially created out of forest preserve lands by chapter 707 of the Laws of 1892. The park was comprised of land in certain designated forest preserve counties, and the land was to be forever reserved, maintained and cared for as ground open for the free use of all the people, for their health and pleasure, and as forest lands necessary to the preservation of the headwaters of the chief rivers of the State, and a future timber supply. (Today this is ECL 9-0301.)
Today, the power of the Forest Commission (now the Department of Environmental Conservation or ENCON) to control and supervise the lands within the forest preserve, including the Adirondack Park, has been continued (ECL 9-0105). The specific boundaries of today’s Adirondack Park, traditionally called the "blue line”, can be found in ECL 9-0101 (subd [1]), and today’s definition of forest preserve lands is at ECL 9-0101 (subd 6).
The definition of the Adirondack Park includes all the land within the specifically designated boundaries, and this technically includes the privately owned lands as well as publicly owned property. It is important to remember that although the Adirondack Park is wholly contained within forest preserve lands, the Constitution and the statutes give a different treatment to forest preserve lands depending upon whether they are within or without the park’s boundary.
When ENCON regulates and controls the Adirondack Park, it must be kept in mind that although the technical definition of the park includes the privately owned land within its boundaries, the practical power of ENCON to regulate the 3,448,672 acres of privately owned property within the park is limited. The "forever wild” language of section 1 of article XIV applies only to forest preserve lands, and as previously pointed out, the forest preserve lands do not include the privately owned land within the designated counties. Under these circumstances, the "forever wild” mandate only applies to about 39% of the Adirondack Park lands, which is all that is publicly owned. (NYS Conservation Dept Report, The Adirondacks, New York’s Forest Preserve and a Proposed National Park, p 5.)
*601 "Responding to the opposition which greeted a study recommending that part of the Adirondacks be made a National Park and to the lack of local initiative in the 107 towns of the Park for land use planning to meet the threat of uncontrolled development, in 1968 Governor Nelson A. Rockefeller created the Temporary Study Commission on the future of the Adirondacks.” (Savage and Sierchio, The Adirondack Park Agency Act: A Regional Land Use Plan Confronts "The Taking Issue”, 40 Albany L Rev 447, 448 [1976].)
As a result of this study, the State Legislature adopted the Adirondack Park Agency Act. (Executive Law, art 27; L 1971, ch 706). Section 801 of the Executive Law sets forth the legislative findings and purposes in promulgating this act. Pertinent portions of this section are as follows:
"The Adirondack park is abundant in natural resources unique to New York and the eastern United States. The wild forest, water, wildlife and aesthetic resources of the park provide an outdoor recreational experience of national and international significance. Growing population, advancing technology and an expanding economy are focusing ever-increasing pressures on these priceless resources.
"Our forefathers saw fit nearly a century ago to provide rigid constitutional safeguards for the public lands in the Adirondack park. Today forest preserve lands constitute approximately forty percent of the six million acres of land in the park. The people of the state of New York have consistently reiterated their support for this time-honored institution.
"Continuing public concern, coupled with the vast acreages of forest preserve holdings, clearly establishes a substantial state interest in the preservation and development of the park area. The state of New York has an obligation to insure that contemporary and projected future pressures on the park resources are provided for within a land use control framework which recognizes not only matters of local concern but also those of regional and state concern.
"In the past the Adirondack environment has been enhanced by the intermingling of public and private land. A unique pattern of private land use has developed which has not only complemented the forest preserve holdings but also has provided an outlet for development of supporting facilities necessary to the proper use and enjoyment of the unique wild forest atmosphere of the park. This fruitful relationship is *602 now jeopardized by the threat of unregulated development on such private lands. Local governments in the Adirondack park find it increasingly difficult to cope with the unrelenting pressures for development being brought to bear on the area, and to exercise their discretionary powers to create an effective land use and development control framework.
"The basic purpose of this article is to insure optimum overall conservation, protection, preservation, development and use of the unique scenic, historic, ecological and natural resources of the Adirondack park.”
The Adirondack Park Agency was created by the enabling legislation to carry out the purposes of the act and most significantly, to develop two separate land use plans. (L 1971, ch 706.)
Section 805 provided that the "Agency” in consultation with local governments, was to develop a comprehensive land use and development plan applicable to the entire area of the Adirondack Park, except for those areas owned, by the State. Section 807 provided that the "Agency” in consultation with the Department of Environmental Conservation was to develop a Master Plan for the development of State-owned lands located in the Adirondack Park. "Such plan shall (1) classify such lands according to their characteristics and capacity to withstand use and provide general guidelines and criteria for the management and use of lands within such classifications, and (2) reflect the actual and projected uses of private lands within the park as those uses may be more fully characterized in the development of the land use and development plan provided for in section eight hundred five of this article.” (Executive Law, § 807; L 1971, ch 706.)
In June of 1972, the State Land Master Plan was approved by the Governor and became effective. Thereafter article 27 of the Executive Law was amended to incorporate the Adirondack Park Land Use and Development Plan which had been prepared to guide land use and development on private lands within the Adirondack Park, and also to give legislative sanction to the previously Governor-approved State Land Use Master Plan which guided land use on publicly owned property within the Adirondack Park. (L 1973, ch 348.) Presently, subdivision 3 of section 816 of the Executive Law provides that the "Agency” and ENCON are authorized to develop rules and regulations necessary, convenient or desirable to carry out the purpose of the State Land Master Plan.
*603 With the analysis of the formulation and adoption of the State Land Master Plan in mind, we can now proceed to meet the issues raised in this pending litigation. Petitioners’ second cause of action states in essence that the Master Plan violates section 1 of article XIV of the New York State Constitution in that it allows and encourages certain uses within the State forest preserve lands which violate the constitutional mandate of "forever wild”. The "forever wild” concept has been discussed at length earlier, but it will be remembered that this important constitutional provision only applies to forest preserve lands, which forest preserve lands include only publicly owned lands within certain designated counties as defined by the Legislature.
Therefore, the petitioners are not challenging the validity of the Adirondack Park Agency Act as a whole or the establishment of the "Agency”, and even more significantly, petitioners are not challenging the validity of the Adirondack Park Land Use and Development Plan as that plan applies only to privately owned land within the park. Accordingly, this decision will not deal with any issues presented in the private land use sector.
The Adirondack Park Agency Act has previously withstood constitutional challenges. (Wambat Realty Corp. v State of New York, 41 NY2d 490; Horizon Adirondack Corp. v State of New York, 88 Misc 2d 619.)
There appears to be no controversy, and indeed there cannot be, as to the authority of the Legislature to regulate the use of the Adirondack Park. That this authority may be properly delegated to an administrative agency particularly suited to the control and supervision of wild forest lands, such as the Department of Environmental Conservation (ENCON), has been specifically recognized by the courts. (People v Turner, 145 NY 451 supra; People ex rel. Turner v Kelsey, 180 NY 24 supra.)
The delegation of such authority to the Adirondack Park Agency, an administrative agency specifically developed to carry out the provisions of an act formulated to preserve the unique character of the Adirondack Park through controlled development and use, should come within the same reasoning.
Once it is established that the "Agency” was properly conferred with the power to regulate the use and development of the Adirondack Park, it becomes necessary to examine the *604 means that have been developed to regulate such use and development, namely the Master Plan.
The concept of a Master Plan did not originate with the agency, but rather was a directive with statutory force which the Legislature adopted pursuant to the report issued in December, 1970 by the Temporary Study Commission on the Future of the Adirondacks. Three of the major recommendations made in that report were: (1) the preparation of a Master Plan for State lands by the agency; (2) the classification of these lands "according to their characteristics and capacity to withstand use”, and (3) a set of extensive guidelines for the care, custody and control of State lands under the Master Plan.
This report was used by the Legislature in formulating the enabling legislation for the Adirondack Park Agency Act, and that legislation provided, as previously pointed out, for the development of a Master Plan which classified lands according to their capacity to withstand use and which reflected the actual and projected uses of private lands within the park. It was pursuant to this statutory directive that the agency, in consultation with ENCON, devised the present Master Plan which divides the State land within the park into seven different classifications depending upon each area’s particular capacity to withstand use with an idea to preserve the wild forest nature of the park lands (Adirondack Park State Land Master Plan [1972], pp 1-3).
This plan, as previously mentioned was approved by the Governor in 1972, and thereafter approved by the Legislature in 1973 (L 1973, ch 348), and thereupon had the force of a legislative enactment.
The Master Plan divides the State land in the park into the following seven basic categories: (1) wilderness, (2) primitive, (3) canoe, (4) wild forest, (5) intensive use, (6) wild, scenic and recreational rivers, and (7) travel corridors.
The Master Plan itself is instructive on how these categories were arrived at. The main factor considered was the physical characteristics of the land and water as such have a direct bearing upon the capacity of the area to accept human use. Soil, slope and elevation were relevant in their findings, as well as fertility and erosiveness of soil which indicate the fragility of significant portions of State lands within the park. Biological considerations which included examination and consideration of wetland ecosystems and wildlife values were *605 also relevant factors. Specific examples of factors which were considered were the "impact of snowmobiles on deer wintering yards; the effect of numbers of hikers or campers near the nesting habitat of rare and endangered species such as the eagle or the spruce grouse, or the problems associated with motorized access to bodies of water with wild strains of native trout”. (Adirondack Park State Land Master Plan [1972], p 6.)
It was also felt that the classification system should take into account the existing facilities and uses to which the land was being put by the public, as well as the policies followed by the various administering agencies. At page 7, the plan sets forth the following relevant language: "If there is a unifying theme to the classification system, it is that the protection and preservation of the natural resources of the state lands within the Park should be paramount. Human use and enjoyment of those lands should be permitted and encouraged, so long as the resources in their physical and biological context and their psychological aspects are not degraded. This theme is drawn not only from the Act and its legislative history, but also from over three quarters of a century of the public’s demonstrated attitude toward the forest preserve and the Adirondack Park. * * *
"No structures, improvements or uses not now established on the forest preserve are permitted by these guidelines and in many cases more restrictive management is provided for. Obviously, these guidelines are subject to any future legal rulings further restricting uses of the forest preserve and they are not to be considered as attempts to make constitutional determinations(Adirondack Park State Land Master Plan [1972], p 7; italics added.)
There is no reason to analyze in detail the seven basic categories set forth in the plan, as the basis of the plaintiffs’ objection is that the very concept of the plan which provides for different uses in different portions of the forest preserve (Adirondack Park), some of these uses requiring a cutting of timber, violates the constitutional mandate that all of the lands in the forest preserve shall be kept forever wild and prohibits the cutting of timber thereon.
As previously discussed, the first cause of action sets forth numerous uses of the forest preserve which the plaintiffs contend violate the "forever wild” mandate, but the determination of the constitutionality of these uses necessarily requires a trial as they all present questions of fact regarding *606 their reasonableness, especially in light of the amount of timber on preserve land which had to be cut in order to establish them. However, it has already been determined with reference to the MacDonald case that some cutting of the timber in the preserve, depending on the facts in each case may be authorized if it is reasonable and does not impair the wild forest nature of the preserve. With this in mind, it is possible to determine the validity of a Master Plan which allows for uses which have involved cutting of timber in the past, without making a finding as to whether such cutting was constitutionally permissible or not. In fact, the language of the plan previously set forth recognizes that some of the uses which it authorizes may later be declared unconstitutional by the courts. So if the plan itself is found to be valid, such a finding should in no way be affected by a subsequent finding that any given authorized use is invalid. (Adirondack Park State Land Master Plan [1972], p 7.)
In this light the concept of the Master Plan would normally be measured as a means of zoning, and an analysis would require the application of several well-recognized principles. The traditional zoning cases and controversies are the result of a comprehensive land use plan which dictates what a private individual may do on his own land. This would be the situation when challenging the Adirondack Park Land Use and Development Plan, but it is not the case presently before this court. In any event, this suit was commenced strictly within the parameters of the Appellate Division decision which allowed a suit only to restrain violations of section 1 of article XIV of the New York State Constitution. Once it is determined that the concept of the Master Plan does not violate section 1 of article XIV, then this court need not, and indeed cannot go any further. As far as can be determined in the instant action, the Master Plan is constitutional, as a matter of law, and summary judgment pursuant to CPLR 3211 (subd [c]), dismissing the second cause of action, should be granted to defendants.
In plaintiffs’ third cause of action they set forth a pleading in the alternative. First they state that all of the uses alleged to be unconstitutional in the first cause of action are, in fact, constitutionally permissible. It is then alleged that the landing of seaplanes on the lakes and ponds within the park is no more deleterious to the forever wild nature of the park than these other contitutionally permissible uses. In light of this, *607 the plaintiffs contend that regulation 6 NYCRR 196.4, which prohibits the use of mechanically propelled vessels and aircraft upon some 700 lakes and ponds which are wholly surrounded by State land within the forest preserve, is violative of section 1 of article XIV.
It is also contended that various officials of the agency and ENCON have violated 6 NYCRR 196.4, but such an allegation is irrelevant to this cause of action and should be stricken.
Plaintiffs’ basic theory behind this third cause of action is that it is just as much a violation of section 1 of article XIV to arbitrarily prohibit reasonable uses of the forest preserve as it is to permit uses which are obviously unreasonable and unconstitutional.
In the discussion of the "forever wild” clause it was pointed out that the preserve was not to be closed to the public, but was to be held open for all of the public to enjoy in its natural wild state. Therefore, plaintiffs’ main theory is correct, and any regulation which arbitrarily restricts public access to or a reasonable public use of the lands in the preserve is violative of section 1 of article XIV.
Since this is a motion for summary judgment, this court must determine if such regulation is valid or invalid as a matter of law, or if questions of fact are presented which cannot be resolved upon the motion papers alone, the motion must be denied and a trial held to determine such issues.
The Commissioner of Environmental Conservation has the statutory authority to promulgate rules and regulations for the management and preservation of the forest preserve lands. (ECL 1-0101, 3-0301, 9-0105; Executive Law, § 816.) This authority includes the duty to make regulations reasonably calculated to preserve the unique qualities of special resources such as the Adirondack forest preserve (ECL 1-0101, subd 3, par d) and to provide for prevention and abatement of all water, land and air pollution, including noise and gases (ECL 3-0301, subd 1, par i). A further mandate which ENCON must follow in promulgating these regulations is the State Land Master Plan provision as to the wilderness classification. On page 10 thereof it is provided: "1. Public use of motor vehicles, motorized equipment and aircraft will be prohibited.”
Pursuant to section 816 of the Executive Law, ENCON must develop regulations to implement this directive, and 6 NYCRR 196.4 is an obvious attempt to do so. (Helms v Diamond, 76 Misc 2d 252, supra.)
*608 The regulation in question appears to bear a reasonable relation to a bona fide purpose as set forth previously and is consistent with other ENCON regulations regarding access of motorized vehicles to other portions of the forest preserve (6 NYCRR 196.1, 196.2, 196.3). As the court has previously stated in the article 78 proceeding involving the same parties: "The courts will uphold and enforce regulations which are not without rational basis and wholly arbitrary.” (Helms v Diamond, supra, p 259.)
"The concept of prohibiting motor vehicles, motorized equipment, motorboats and landing of aircraft in remote wilderness areas is not new.” (Helms v Diamond, supra, p 260.)
When application was made for a preliminary injunction in that proceeding, this court found that the regulation was not arbitrary and capricious.
As far as the third cause of action is concerned, and specifically in respect to the defense raised by the defendants that there is another action pending, the pending action to which reference is made was an article 78 proceeding which has been discontinued on the merits and with prejudice. That article 78 proceeding attacked 6 NYCRR 196.4 on the grounds that the rule prohibiting the use of mechanically propelled vessels and aircraft on some 700 lakes and bodies of water in the preserve was:
(1) arbitrary and capricious
(2) an abuse of discretion
(3) in violation of lawful procedures
(4) outside the authority of the Environmental Conservation Department of the State of New York
(5) amounted to a taking of petitioners’ business and property without due process of law in violation of both the State and Federal Constitutions.
By virtue of having discontinued the article 78 proceeding with prejudice and on the merits, it would appear to this court that the only question for determination in the present action is whether or not section 1 of article XIV of the New York State Constitution prohibits the making of such a rule or regulation.
The court finds that it does not.
The motion by defendants for judgment dismissing the second cause of action of the complaint for its failure to state a cause of action and granting summary judgment to the *609 defendants is granted, without costs. The plaintiffs’ cross motion is denied in all respects.
The motion of the defendants for judgment dismissing the third cause of action for its failure to state a cause of action and granting summary judgment to defendants is granted, without costs. The plaintiffs’ cross motion is denied in all respects.
The defendants are given 20 days from service of the order herein, with notice of entry thereon, to answer the first cause of action in the complaint.