OPINION OF THE COURT
Michael C. Lynch, J.
In this hybrid special proceeding/declaratory judgment action, petitioners Adirondack Mountain Club and Protect the Adirondacks!, Inc. (hereinafter petitioners) challenge certain conduct by the respondents Adirondack Park Agency (hereinafter APA) and the Department of Environmental Conservation of the State of New York (hereinafter DEC) related to the classification of certain lake and river beds and waterways in the Adirondack Forest Preserve. By decision and order dated September 28, 2010, this court (Lynch, J.) denied respondents’ motion to dismiss the proceeding/action. A conference was held, a schedule for submissions was developed, and with the submission of petitioners’ reply memorandum of law and affidavit sworn April 20, 2011, the matter was fully submitted for consideration.
As set forth in this court’s prior decision and order,[1] petitioners’ challenge involves certain waterways located in the Five Ponds and Round Lake Wilderness Area and the Lows Lake and Hitchins Pond Primitive Areas (hereinafter the affected area). Public access, use, and management of the area has been the focus of dispute for a number of years.
In January 2003, the respondent Department of Environmental Conservation adopted the Bog River Complex Unit Manage *385 ment Plan (UMP). As part of the UMR the DEC was directed to adopt regulations prohibiting the use of floatplanes on Lows Lake within five years. Accordingly, the DEC promulgated regulations prohibiting the public use of motorized watercraft on Lows Lake (6 NYCRR 196.4 [d]), but it did not similarly prohibit floatplanes. In May 2008, petitioners and others commenced a special proceeding to compel DEC to adopt regulations prohibiting public floatplane access to Lows Lake. By decision and order dated January 21, 2009, this court denied respondent’s motion to dismiss the proceeding (Adirondack Mt. Club et. al. v Department of Envtl. Conservation, Sup Ct, Albany County, Jan. 21, 2009, Lynch, J., index No. 4215-08).
At a meeting in April 2009, the APA announced that it was prepared to present a proposal “to proceed to public hearing to classify the waters and lake bed of Lows Lake as well as the newly acquired State lands on the south shore of the Bog River and Lows Lake, and to reclassify the Lows Lake Primitive Area.” On May 14, 2009 the APA authorized public hearings with respect to:
“the proposed classification and reclassification of State lands and waters in the vicinity of Lows Lake and the Five Ponds Wilderness Area . . . The action involves five State land classification proposals totaling approximately 4,384 acres and four State land reclassifications totaling an estimated 8,161 acres. Total acreage involved in the proposal is approximately 12,546 acres. One additional alternative is discussed to include the proposed classification of the lake bed and waters of Bog Lake with an estimated area of 221 acres.” (Exhibit I.)
In June 2009, the APA issued a “Notice of Public Hearing,” completed an environmental assessment form and issued a negative declaration. Public hearings were held in July and August 2009. Meanwhile, by stipulation and order dated July 30, 2009, petitioners discontinued the proceeding against DEC seeking to compel the promulgation of regulations prohibiting the use of floatplanes on Lows Lake. As part of the stipulation, the parties recognized that the APA had, “initialed] the process for amending the Master Plan to classify the bed and waters of Lows Lake and to reclassify certain State-owned lands adjoining Lows Lake, as ‘wilderness.’ ”
On September 11, 2009, the APA adopted a resolution “With Respect to the Classification and Reclassification of Lands, *386 Reservoir Bed and Waters in the Vicinity of Lows Lake, the Lows Lake Primitive Area and the Five Ponds and Round Lake Wilderness Areas” (petition exhibit A). The components of the resolution, which proposed classification and reclassification of approximately 10,827.2 acres of forest preserve land, included,
“[(1)] classification of the western portion of the lake bed and waters of the Lows Lake to Wilderness classification and adding them to the Five Ponds Wilderness Area [and] adding the lake bed and waters of Bog Lake to the Five Ponds Wilderness Area; [and (2)] classification of the eastern portion of the lake bed and waters of the Bog River and Lows Lake to the Eastern Five Ponds Access Primitive Area.” (Id.)
The September 11, 2009 resolution was sent to former Governor Paterson for his approval on September 15, 2009 (see Executive Law § 816). At a meeting held on October 9, 2009, the APA decided to reconsider the September 11, 2009 vote because it believed the vote was procedurally flawed. On November 13, 2009, the APA passed a resolution, again “With Respect to the Classification and Reclassification of Land, Reservoir Bed and Waters in the Vicinity of Lows Lake, the Lows Lake Primitive Area and the Five Ponds and Round Lake Wilderness Areas.” The November 13, 2009 resolution,
“removed the wilderness classification of the western portion of the lake bed and waters of Lows Lake and all of the lake bed and waters of Bog Lake and the addition of these water areas to the Five Ponds Wilderness Area . . . [and] eliminated the classification of the bed and waters of the Bog River and the eastern portion of Lows Lake and its addition to the newly formed Eastern Five Ponds Access Primitive Area.”
As a result, petitioners now explain, “the upland areas in question were classified as either Wilderness or Primitive Areas, but . . . the bed and waters of Lows Lake, the Bog River and Bog Lake were left unclassified” (petition 1i 154).
Now, by their first cause of action, petitioners allege that the November 13, 2009 resolution was arbitrary and capricious and affected by error because (1) it was contrary to the Adirondack Park State Land Master Plan (APSLMP) and Adirondack Park Agency Act (APA Act); (2) there was no prior proposal to remove the beds and waters of the waterways from the classification, and no public notice, hearing or opportunity for public comment *387 on this alternative; (3) the APA resolution dated September 11, 2009 classification remains in effect; and (4) the determination to leave the bed and waters of Lows Lake, Bog River, and Bog Lake unclassified was not subjected to review pursuant to the State Environmental Quality Review Act (SEQRA). Petitioners also seek a declaration that over 9,100 acres of state forest preserve land and water in the vicinity of Lows Lake was classified as wilderness and/or primitive in 1987.
The Adirondack Park Agency Act (Executive Law, art 27, § 800 et seq.) was enacted in 1971 “to insure optimum overall conservation, protection, preservation, development and use of the unique scenic, aesthetic, wildlife recreational, open space, historic, ecological and natural resources of the Adirondack park” (Executive Law § 801) and, further, “to focus the responsibility for developing long-range park policy in a forum reflecting statewide concern” (id.). The statute expressly recognizes, the “unique pattern of private land use” in the Adirondack forest preserve (id.).
As part of the APA Act, the Legislature authorized and directed the APA to develop, in consultation with DEC, a, “master plan for management of state lands” (Executive Law § 816 [l]).[2] The master plan authorized by Executive Law § 816, known as the Adirondack Park State Land Master Plan (Master Plan), is subject to approval by the Governor (id.). DEC was directed to develop, in consultation with the APA, individual management plans for units of land classified in the APSLMP (id.). Together, the APSLMP and the individual unit plans, known as UMPs, “guide the development and management of state lands in the Adirondack Park” (Executive Law § 816 [1]). The statute directs that both the APSLMP and UMPs be “reviewed periodically” (Executive Law § 816 [2]). Amendments to the APSLMR prepared by the APA in consultation with DEC, are subject to the governor’s approval (id.). Because the APSLMP and amendments thereto are subject to approval by the Governor, it has been construed as having, “the force of a legislative enactment” (Helms v Reid, 90 Misc 2d 583, 604 [1977]).
*388 Here, the question presented by the first cause of action is whether the APA’s November 2009 resolution, “was affected by an error of law or was arbitrary and capricious or an abuse of discretion” (CPLR 7803 [3]). In this court’s view, the APA’s November 13, 2009 resolution was a “quasi-legislative” act (see New York City Health & Hosps. Corp. v McBarnette, 84 NY2d 194, 203 n 2 [1994]) subject to review under the “ ‘arbitrary and capricious’ standard.” Accordingly, this court: “inquires whether the determination under review had a rational basis. Under this standard, a determination should not be disturbed unless the record shows that the agency’s action was ‘arbitrary, unreasonable, irrational or indicative of bad faith.’ ” (Matter of Halperin v City of New Rochelle, 24 AD3d 768, 770 [2005], appeal denied 7 NY3d 708, quoting Matter of Cowan v Kern, 41 NY2d 591, 599 [1977].)
The APSLMP developed pursuant to Executive Law § 816 establishes a classification system for all “state lands” located within the Adirondack Park.[3] The APA has interpreted the term “ ‘state lands’ ... to mean land held in the name of, owned by or under long-term lease to the State of New York or a state agency” (APSLMP at 1). The APSLMP organizes state land into separate units and classifies each unit into nine categories based on “their characteristics and capacity to withstand use” (APSLMP at 14). The nine classifications range from wilderness, the most restricted category of state land, to “Travel Corridors,” which category, as the name suggests, includes state land managed with other agencies to provide public access to the Adirondack Park. As relevant to this dispute, the public use of motor vehicles, motorized equipment and aircraft is generally prohibited on state land classified as “wilderness” and “primitive” (APSLMP at 23).
As set forth above, in the November 13, 2009 resolution, the APA did not propose a classification for the bed and waters of Lows Lake, the Bog River and Bog Lake. In petitioners’ view, the resolution was thus contrary to the requirements of the APSLMP and/or the APA Act (1) that land acquisitions be classified as promptly as possible; and (2) that all Adirondack Forest Preserve lands and waters be classified (petition 1Í1Í156, 158, 161).
*389 In opposition to the petition, respondents submit an affidavit by John Banta, the APA’s general counsel. He avers that State-owned water bodies and underwater lands are not classified under the APSLMP (at 13, 16,18). More specifically, he explains:
“When the [APA] prepared the initial Master Plan in 1971-1972, the State owned far less land within the Park, and specifically far less shoreline and land under water. Where the State owned only a portion of the shoreline and bed of a water body, the State-owned bed could not be classified because the State’s jurisdiction to apply the Master Plan’s management guidelines did not extend to the entire bed of the water body, nor could it. On those water bodies where the State owned only a portion of the bed and shoreline, application of the master Plan’s management guidelines to the entire water body could conflict with private title and littoral rights associated with the waters adjoining the privately-owned shoreline” (1Í16).
Mr. Banta avers that generally, it is “within the [APA’s] discretion to determine that State-owned bodies of water should not be classified, especially those bodies of water where the State does not own all of the upland around them” (1Í 22). Further, he explains that here, the APA’s determination to not classify the beds and waters of Lows Lake, the Bog River, and Bog Lake was lawful and within its discretion under the APA Act and the Master Plan (11 50) because
“[t]he Agency members and designees were concerned that the classification proposal presented to them in September 2009 was the first time in 37 years that they were presented with a proposal to classify a State owned body of water where the State did not own all of the shorefront around the water body and thereby control all of the littoral rights associated with the body’s waters. A majority of the Agency members and designees determined in their discretion that these water bodies around which there is privately owned shorefront should remain unclassified. The Master Plan does not regulate privately-owned lands, including privately-owned littoral/riparian rights. Yet the ‘wilderness’ classification for the beds and waters of Lows Lake, the Bog River, and Bog Lake that petitioners are seeking would purport to do so.”
The APA’s determination that it did not have to propose a classification for State-owned bodies of water where the State *390 did not own all of the shorefront around the water was a matter of statutory interpretation of the APA Act and the APSLMi) thus this court is not required to defer to the APA’s interpretation of the APA Act and the APSLMP (Matter of Lewis Family Farm, Inc. v New York State Adirondack Park Agency, 64 AD3d 1009, 1013 [2009]). For the following reasons, the court finds that the APA Act and the APSLMP require the APA to classify State-owned bodies of water even if the water is contiguous to a private land holding.
The APSLMP provides that “once new lands have been acquired the Act requires the master plan to be revised by classifying the lands and setting guidelines for their management and use pursuant to the statutory procedures” (APSLMP at 7). Further, “land acquisitions should be classified as promptly as possible following acquisition” (APSLMP at 8). The APA Act defines “[l]and” as “the earth, on or below the surface of the ground, including water and air above, the flora and fauna” (Executive Law § 802 [27]). Here, it is not disputed that the affected areas were acquired in 1985 and 1986. Further, it is not disputed that there are private landowners on Lows Lake and Bog Lake and that these owners have littoral or riparian rights to the contiguous bodies of State-owned water (Banta aff 1i 33) .[4]
The APSLMP recognizes that
“[t]he water resources of the Adirondacks are critical to the integrity of the Park . . .
“Waters, particularly lakes and ponds, have their carrying capacity from a physical, biological and social standpoint just as do tracts of public or private land. The use made of state waters also has a direct impact on adjacent land holdings” (at 3-4).
Further, it provides, “[a] genuine need exists to insure that the scale and intensity of water-oriented uses are consistent with uses of adjoining state and private lands and the general character of the Park, particularly so far as the type, speed and number of boats are concerned” (id. at 4).
The APSLMP’s general explanation of the classification system does not exclude State-owned water in general or State-owned water that is contiguous to privately held land. For *391 example, the APSLMP explains that the basic factor involved has been “the physical characteristics of the land or water which have a direct bearing upon the capacity of the land to accept human use” (APSLMP at 14). With respect to water, the
“temperature, chemistry, volume and turnover rate of streams or lakes, all affect the carrying capacity of the land or water both from the standpoint of the construction of facilities and the amount of human use the land or water itself can absorb . . . [and] rivers, streams, lakes and ponds and their environs often present special physical problems” (id. at 14).
As for water with contiguous privately held land, the APSLMP provides:
“The unique mixture of public and private land within the Park also requires that account be taken of facilities and uses being made on contiguous or nearby private lands. Thus a large private inholding subject to or threatened by some form of intensive use might prevent the designation of an otherwise suitable tract of state land as wilderness” (at 15).
Moreover, the specific descriptions of each classification category do not exclude State-owned water. For example, a “wilderness area” is defined “to mean an area of state land or water having a primeval character, without significant improvement or permanent human habitation” (APSLMP at 20). In comparison, a “primitive area is an area of land or water that is . . . [essentially wilderness in character but, ...(b) contains, or is contiguous to, private lands that are of a size and influence to prevent wilderness designation” (APSLMP at 26).
Based on the foregoing provisions of the APA Act and the APSLMI] the court agrees with petitioners that the APA’s determination to not propose a classification for the bed and waters of Lows Lake, the Bog River and Bog Lake was arbitrary and capricious. Although the APSLMP confirms that the factors to consider while assigning a classification to state land or water are “complex” and the application of the factors is “subjective” (at 15), no provision of the APA Act or the APSLMP provides or suggests that the APA can choose not to propose a classification for state land, including State-owned bodies of water and State-owned water subject to littoral or riparian rights (Executive Law § 802 [27]; APSLMP at 14-15). That littoral or riparian rights exist is a characteristic that must be considered and that will impact the classification that is proposed. It does not excuse the APA from performing its duty to propose a classification for the State-owned body of water.
*392 As a result of the foregoing, the court declines to consider petitioners’ remaining procedural challenges to the November 2009 resolution. It is, however, necessary to consider petitioners’ request for certain declaratory relief, to wit: (1) whether the September 2009 resolution remains in effect; and/or (2) whether the affected area was classified in 1987.
The APA Act provides that the agency is comprised of 11 voting members (Executive Law § 803). Eight members are appointed by the Governor, and the remaining three are the Commissioners of the Departments of Environmental Conservation and Economic Development, and the Secretary of State (id.). Each Commissioner “may, by official authority filed in their respective agencies, and with the Adirondack park agency, designate a deputy or other officer to exercise his powers and perform his duties, including the right to vote, on the agency” (id.).
At the meeting held on September 11, 2009, the APA voted six to four in favor of the resolution that proposed to classify the waters and beds of Lows Lake, the Bog River, and Bog Lake. One member, Mr. Walsh, who voted in favor of the resolution, attended as the Department of Economic Development’s designee (see exhibit W). At the meeting held on October 9, 2009, one of the members made a motion to reconsider the September 11, 2009 resolution because Mr. Walsh was not an employee of the Department of Economic Development (DED) when he voted in favor of the resolution on September 11, 2009. After a vote the motion passed.
Petitioners now contend that the September 2009 vote was valid because although Mr. Walsh was not an employee of the DED, there is no evidence that he was not the designee of the DED. Further, petitioners argue that the September 2009 resolution was never formally rescinded, thus, it remains available for approval by the Governor.
Under the circumstances presented, the court finds that the APA’s determination to reconsider the September 11, 2009 was not arbitrary, capricious, affected by an error of law, nor was it an abuse of discretion. As a general rule, so long as there is no statutory prohibition, the APA “has inherent power to reconsider its determinations upon a showing of new facts” (Matter of Carter v Adirondack Park Agency, 203 AD2d 788, 789 [1994], lv dismissed 84 NY2d 1026 [1995]). Further, the APA’s Rules permit consideration of a request to reconsider prior agency actions “based upon new information or changed conditions which may materially alter the basis therefore” (“Resolution of the *393 Adirondack Park Agency on Delegating Certain Powers and Responsibilities” art III [respondents’ exhibit FFF]).
Here, the APA properly called into question the validity of the September 11, 2009 vote because one of the voting members was not an employee of the Department of Economic Development at the time of the vote and thus could not serve as the Commissioner’s designee (see e.g. Matter of Kiernan v Bronstein, 73 Misc 2d 629, 632 [1973] [“(w)here the statute delegates power to a single executive head, the general rule is that ‘the legislature, understanding the impossibility of personal performance, impliedly authorized the delegation of authority to subordinates’ ”]). In this court’s view, the vote to reconsider sufficiently rescinded the September 11, 2009 resolution. Accordingly, to the extent that the petitioners seek a declaration that the September 11, 2009 resolution remains in effect, the application is denied.
Petitioners also seek a declaration that the bed and waters of Lows Lake, the Bog River and Hitchins Pond which were acquired in 1985 and 1986 were classified as wilderness and primitive in 1987 (second cause of action). In support of this claim, petitioners submit an affidavit by Peter S. Paine, who served as a member of the Adirondack Park Agency from 1971 until 1995. Mr. Paine explains that in 1986, the State acquired uplands on the south side of Lows Lake, certain islands in the lake, the waters and lands under water in much of the eastern and southern parts of the lake in a land purchase from the Boy Scouts of America referred to as “QAFP (STL) 158.” The remaining portions of Lows Lake, Grass Pond, and the surrounding upland areas were acquired in 1985 from the Yorkshire Timber Company in a land purchase referred to as “QAFP (STL) 156.” According to Mr. Paine, Lows Lake is also referred to as the “Bog River Flow.”
According to Mr. Paine, on October 3, 1986, Agency staff submitted to the APA a list of newly acquired property and proposed classifications for the acquisitions, including the “Bog River Flow acquisition (9,135 acres of land and water)” (Paine aff exhibit C; respondents’ exhibit GG). Thereafter, the APA issued a notice in December 1986 scheduling public hearings on the proposed classifications (Paine exhibit D; respondents’ exhibit HH) and the APA issued a negative declaration pursuant to SEQRA in January 1987. After the scheduled hearings were held, the APA staff prepared a summary of the hearing discussions and comment letters (Paine exhibit H; respondents’ exhibit KK).
*394 On May 7, 1987, Agency staff sent a memorandum to the members of the APA describing the “1985-1986 Annual Classification of State Land” (Paine exhibit J). Therein, the staff member advised that “[t]he Bog River acquisitions (St. Lawrence 130, 156, 158, and 159) totaling 9,100 acres of land and water will be discussed in a separate staff memorandum” (Paine exhibit J). A separate memorandum dated May 11, 1987 regarding the “Classification of the Bog River Flow Acquisition and Reclassification R86-6” (respondents exhibit LL, hereinafter the Scrafford Memo) explained that the “acquisition consists of four acquisitions . . . totalling] 9,100 ± acres of land and water.” Further:
“The most prominent feature of the area is water which totals 2,680 ± acres and extend in excess of 10 miles from the lower dam on the east to the west shore of Lowes Lake [szc]. Contiguous with the water bodies are extensive marshes and emergent wetlands. In addition, on Lowes Lake [szc] and the Bog River above the upper dam, there are a number of large floating bogs.”
The Scrafford Memo described the recommended classifications as follows:
“1. QAFP 156 and 158 (around Lowes [szc] Lake) are proposed to be classified Wilderness and two primitive corridors created to provide for the rights-of-way to the inholding on Parkers Island and the right-of-way to International paper lands north of Bog Lake. . . . The area being classified Wilderness is 6,413 acres and the two primitive corridors will be included in the description of the Lowes Lake Primitive Area”
and, “2. with respect to QAFP 159 and 130 the proposed recommendation is to create two primitive areas . . . The first is the area generally west of the upper dam and road leading to it.” This primitive area, “the Lowes Lake Primitive Area” is described as containing 1,042 acres of state land and 61 acres of water (id.). The Scrafford Memo was incorporated in and made a part of the APA’s resolution approving the proposed classifications (Banta aff 1i 65).
In July 1987, the APA sent its proposed classification of “9,100 acres of land and water” as part of the “Bog River Flow' acquisition” to former Governor Cuomo (Paine aff exhibit L). In May 1988, former Governor Cuomo approved the classification, noting,
*395 “I am particularly pleased to approve the classification of the 9,100 acre Bog River Flow acquisition . . . These magnificent canoe waters were closed to the public throughout the 20th century. This acquisition goes a long ways towards creating a 200 mile wilderness canoe route from Sackett’s Harbor via the Black the Beaver, across Stillwater, Ne-HaSa-ne, Lake Lila, the Bog, Tupper Lake, then the Raquette to Massena” (Paine aff exhibit M).
Paine contends that the documentation preceding the 1987 resolution that proposed classification of the 1985 and 1986 acquisitions demonstrate that the Governor approved the classification of the bed and waters of Lows Lake, Hitchins Pond, the Bog River, and Grass Pond. For example, in the notice of public hearings, the Agency action was described as “amendments to the [APSLMP] to: a. classify 42 parcels (. . . including 9,100 acres of land and water at the Bog River Flow) acquired by the State between April 1, 1985 and March 31, 1986.” Similarly, in the “Notice of Determination of Nonsignificance,” the APA described the action as,
“the classification of four parcels of land, totaling 9,135 acres of land and water, acquired between April 1, 1984 and March 31, 1985 by the State of New York in the Adirondack Park and referred to as the Bog River Acquisition . . . These . . . parcels . . . are proposed to be classified according to the Classification System and Guidelines of the [APSLMP] as Wilderness (9,100 acres) with Primitive Corridors (35 acres).”
The APA’s hearing summary includes a summary of Agency staff’s introductory statements. In pertinent part, staff explained at its hearings:
“The Bog River Flow acquisition consists of 4 separate . . . parcels totaling 9,100± acres of land and water. The most prominent and obvious feature of the area is the amount of water; some 2,680 ± acres of water extending in excess of 10 miles from east to west and including the Bog River, Lowes Lake, Hitchins Pond and Grass Pond.”
Agency staff continue to describe particular characteristics of the bodies of water, such as the “large floating bogs” on Lows Lake, and marshes and emergent wetlands on Hitchins Pond. The hearing summary indicates that there was some question with regard to the management of Lows Lake if it were classi *396 fled as “Wilderness” and Agency staff confirmed that management of an area is an issue that is distinguished from classification and not governed by the APSLMP Further, with respect to the classification of the body of water, Agency staff distinguished its proposal from prior proposals:
“In the past in cases such as Thirteenth Lake, when there is private land and wilderness adjoining a lake, the lake has not been deemed a Wilderness Lake and closed to motor boats. Whether or not the public can in fact be precluded from using motor boats is a separate question and will not be resolved by the classification process. It may, however, be resolved by management of the area by DEC.”
Respondents contend that the documentary evidence supports its interpretation that the water bodies were not classified in 1987 and that this court should defer to the APA’s interpretation of the 1987 resolution (see Matter of Campion v New York State Adirondack Park Agency, 188 AD2d 877 [1992]). More specifically, respondents refer the court to the Scrafford Memo, which explains in a section titled, “Discussion”:
“During the public hearings no oral comments and only two letters were received in opposition to this proposal. We did, however, receive comments questioning the classification of the eastern portion of the tract (QAFP 159 and 130 — around Hitchins Pond) as Wilderness. The concerns were not with the concept of managing the area according to Wilderness standards but that the area did not meet the definition of Wilderness: 1) due to the fact that it was not connected to the western area (QAFP 156 and 158 — around Lowes Lake) and was less than 10,000 acres in size; 2) due to the existence of the several nonconforming uses; and 3) due to impact of the large inholding of private land.” (See exhibit LL at 3 [emphasis added].)
Respondents also refer to the “Staff Recommendation” section of the Scrafford Memo, set forth in relevant part above, to the extent that it references, “1. QAFP 156 and 158 (around Lowes Lake)” (id. at 4 [emphasis added]).
In this court’s view, respondents’ reliance on the above parenthetical descriptions of the area, the phrases, “around Lowes Lake” (sic) and “around Hitchins Pond” taken out of context, fail to provide a rational basis for their interpretation that the 1987 resolution excluded the bed and waters within the *397 acquisitions. Notably, the QAFP 156 and 158 acquisitions are described in the Scrafford Memo as totaling 6,413 acres in size. As Mr. Paine explains, this acreage would not be possible if the water was not included as part of the classified area. Moreover, as Paine explains, the documents demonstrate that the acreage of the Bog River Flow acquisitions totaled 9,135 acres of land and water. This acreage necessarily includes water within the total. Accordingly, and based on the documentation set forth above, former Governor Cuomo’s 1987 approval of “the classification of the 9,100 acre Bog River Flow acquisition” included the beds and waters of Lows Lake, Hitchins Pond, the Bog River and Grass Pond.
The court has reviewed the parties’ remaining arguments, including petitioners’ requests for fees pursuant to the Equal Access to Justice Act (CPLR art 86) and finds them to be either without merit, moot, or academic given this court’s determination. Under the circumstances, the respondents’ determinations, although erroneous, were substantially justified (CPLR 8601).
Accordingly, based on the foregoing, it is ordered and adjudged that the petition is granted; and it is further ordered and adjudged that the November 13, 2009 resolution is annulled; and it is further ordered, adjudged and declared that the 1987 classification of the 9,100 + acres in the Bog River Flow area included the beds and waters of Lows Lake, Hitchins Pond, the Bog River, and Grass Pond.

. The facts and background are set forth in greater detail in the prior decision and order.

. In addition to its responsibilities with regard to state land in the Adirondack Park, the APA is also responsible for regulating private land use and development in the Adirondack Park (Executive Law § 805; Matter of Hunt Bros. v Glennon, 81 NY2d 906, 909 [1993]). In this regard, “[t]he agency’s powers and goals thus resemble those of both a local planning board and a local zoning entity” (id.).

. A pdf file of the APSLMP can be found on the Department of Environmental Conservation website at: http://www.dec.ny.gov/docs/ lands_forests_pdf/adk.pdf.

. A littoral or riparian right to navigable water in New York State is distinguishable from a claim of right to land under water (see generally 7 Warren’s Weed, New York Real Property § 77.31 [5th ed]). Here, it does not appear that any private land owner has asserted a claim of right to land under any of the State-owned water.